UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LESLIE TOUSSAINT,

                              Plaintiff,

        v.

NY DIALYSIS SERVICES, INC.,

                              Defendant.

No. 14-CV-5069 (KMK)

OPINION & ORDER

Appearances:

Michael Howard Sussman, Esq.
Michael Anthony Deem, Esq.
Goshen, NY
*Counsel for Plaintiff*

Eve I. Klein, Esq.
Katelynn Mimi Gray, Esq.
Duane Morris, LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Leslie Toussaint ("Plaintiff") filed the instant Complaint against Defendant NY

Dialysis Services, Inc. ("Defendant") alleging that Defendant discriminated against Plaintiff on

the basis of race, in violation of 42 U.S.C. § 1981 and N.Y. Exec. Law § 296, because Defendant

terminated Plaintiff after an incident with a coworker, but not the "non-Black" coworker also

involved in the incident.  (*See* Dkt. No. 1.)  Before the Court are Defendant's Motion for

Summary Judgment and Motion for Sanctions.  (*See* Dkt. Nos. 48, 51.)  For the reasons to

follow, Defendant's Motion for Summary Judgment is granted and Defendant's Motion for

Sanctions is denied.

## I.  Background

### A.  Factual Background

The following undisputed facts are taken from the evidence submitted by the Parties and from the statements submitted by the Parties pursuant to Local Rule 56.1.

#### 1.  Defendant's Business & Policies

Defendant is an entity wholly owned by Fresenius Medical Care Holdings, Inc., a company involved in the manufacture and distribution of dialysis equipment, medication, and supplies and in the provision of clinical dialysis services to patients with end-stage renal disease. (*See* Aff. of Denise Patterson in Supp. of Mot. for Summ. J. ("Patterson Aff.") ¶¶ 2–3 (Dkt. No. 54); *see also* Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 1 (Dkt. No. 55); Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute ("Pl.'s 56.1") ¶ 1 (Dkt. No. 59).)[1]  Defendant owns a number of dialysis clinics, including a clinic in Middletown, New York, where Plaintiff worked during the relevant time period.  (*See* Patterson Aff. ¶ 3; *see also* Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.)

Defendant has a number of policies relevant to this dispute.  First, Defendant has an Equal Employment Opportunity Policy, which states that Defendant "is an equal opportunity employer and does not tolerate unlawful discrimination against any individual."  (Patterson Aff. Ex. A; *see also* Def.'s 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)  That policy was adopted in its current form on September 1, 2009.  (*See* Patterson Aff. Ex. A; *see also* Pl.'s 56.1 ¶ 6.)  Defendant also maintains a policy regarding corrective action for employees who fail to follow "established standards of

---

[1] The Court finds unhelpful Plaintiff's insistence on "denying" or qualifying facts alleged to be undisputed by Defendant merely because he disagrees with their significance in the case or finds other facts more relevant.  (*See, e.g.*, Pl.'s 56.1 ¶¶ 6, 19, 20, 22, 24, 27, 35, 47, 58, 63, 65, 67, 69, 71, 74.)  The place for a nonmovant to assert additional undisputed facts is in the 56.1 counterstatement, not in the response to the movant's 56.1 statement.  *See* S.D.N.Y. Civ. R. 56.1. In any event, the Court will of course parse the record carefully and resolve the Motions solely on facts not disputed by the Parties.

conduct and job performance." (*See* Patterson Aff. Ex. B.)  Where an employee violates policy or engages in inappropriate workplace behavior, Defendant's policy is to investigate the incident or allegation, discuss the appropriate corrective action, implement the corrective action and complete the appropriate documentation, and maintain a file of the employee's corrective action forms.  (*See id.*)  Defendant's policy sets forth several tiers of corrective action: (1) documented counseling, (2) written warning, (3) final written warning, and (4) termination; Defendant may bypass any of these steps at its discretion.  (*See id.*)

Defendant also maintains a policy instructing employees how to report sexual harassment and general harassment.  (*See* Patterson Aff. Ex. B; *see also* Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.)  This policy directs employees who believe they have been harassed to first try to resolve the issue by discussing the inappropriate behavior with the alleged harasser, and if those attempts are unsuccessful, to report the alleged act to an appropriate supervisor.  (*See* Patterson Aff. Ex. B; *see also* Pl.'s 56.1 ¶ 8.)  While the Parties dispute whether Plaintiff was ever made aware of this policy, (*see* Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9), there is no apparent disagreement that this and other policies were generally available to all employees of Defendant, (*see* Decl. of Eve I. Klein in Supp. of Mot. for Summ. J. ("Klein Decl.") Ex. B, at 125 (Dkt. No. 53)).

Finally, Defendant maintains a Workplace Violence Policy that prohibits "[v]iolent, threatening, aggressive, or abusive behavior."  (Patterson Aff. Ex. C; *see also* Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.)  The Parties agree that Plaintiff was aware that Defendant maintains a policy regarding workplace conduct.  (*See* Klein Decl. Ex. B, at 118; *see also* Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.)

### 2.  Plaintiff's Employment

Plaintiff was hired as a porter/housekeeper at the Middletown Clinic on February 15, 1993.  (*See* Affirmation of Michael H. Sussman ("Sussman Affirmation") Ex. 1 (Dkt. No. 58); *see also* Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.)  Plaintiff contends that in January 2005, he received a promotion to the position of housekeeper.  (*See* Pl.'s 56.1 ¶ 4; *see also* Sussman Affirmation Ex. 2.)  Plaintiff is a Black male.  (*See* Compl. ¶ 2; *see also* Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)

Throughout Plaintiff's employment, he was issued a number of disciplinary write-ups regarding his behavior.  (*See* Patterson Aff. ¶ 14; Patterson Aff. Ex. E; *see also* Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.)  Specifically, Plaintiff's disciplinary record includes the following:

- On July 7, 1994, Plaintiff refused an order from a superior to complete a task, stating that it was not his job.  When Plaintiff was confronted by his supervisor about the incident, Plaintiff "went into a fit of rage again," telling his supervisor that he could fire Plaintiff if he wanted.  (*See* Patterson Aff. Ex. E, at NYDS000144.);

- On October 5, 1994, Plaintiff slammed several patients' chairs against a back wall while loudly stating that he was tired of his "fucking job" and "these fucking people."  Plaintiff was told that he had been addressed before on the issue of obscene language and aggressive behavior.  (*See id.* at NYDS000104.);

- On August 28, 1996, a coworker filed a complaint against Plaintiff for use of inappropriate language, and Plaintiff filed a counter-complaint against his coworker for hostile behavior.  Plaintiff and his coworker were instructed to address each other in a civil and respectful way and not to incite conflict.  (*See id.* at NYDS000101.);

- On August 16, 1996, Plaintiff used profanity in a treatment area while arguing with another staff member.  Plaintiff was given a verbal warning about the use of profanity in front of patients.  (*See id.* at NYDS000103.);

- On December 3, 1996, Plaintiff verbally abused a technician who had asked him to step aside so that she could perform a task.  The disciplinary write-up included language that this would be Plaintiff's "last warning" and that if he could not control his temper, he would be discharged.  (*See id.* at NYDS000102.);

- On March 28, 1997, Plaintiff addressed a coworker in a "confrontational, argumentative[,] and disrespectful manner."  The disciplinary write-up again

4

stated that this would be Plaintiff's final warning.  (*See id.* at NYDS000099–NYDS000100.);

- On July 23, 1999, a coworker complained that Plaintiff had acted inappropriately toward an ailing patient.  (*See id.* at NYDS000098.);

- On August 30, 1999, Plaintiff met with Angie Guasp to discuss his inappropriate behavior and was instructed to perform his tasks in a professional manner.  (*See id.* at NYDS000142.);

- On May 15, 2000, Plaintiff was suspended one day for his belligerent and aggressive behavior after being asked to sweep the floor of a treatment area.  (*See id.* at NYDS000097.);

- On June 9, sometime between 2000 and 2009, a coworker complained that Plaintiff became confrontational when asked to change the water cooler container and used vulgar language toward one of the nurses.  (*See id.* at NYDS000095–NYDS000096.);[2]

- On June 9, 2001, Plaintiff was involved in a loud confrontation with another employee in the treatment area and used obscene and abusive language.  (*See id.* at NYDS000126.);

- On December 30, 2001, Plaintiff was involved in another altercation, reported by a coworker, in which he yelled at another employee.  (*See id.* at NYDS000124.);

- On September 8, 2008, Plaintiff was in an argument with another staff member during which Plaintiff used vulgar language.  Plaintiff was suspended three days.  (*See id.* at NYDS000111.);

- On August 8, 2012, Plaintiff was engaged in another confrontation, which was later reported to management by a coworker, regarding his refusal to clean a chair.  (*See* Patterson Aff. Ex. F.)

Additionally, Plaintiff was disciplined or warned several times for his failure to maintain work standards and his failure to properly clock-in and out.  (*See* Patterson Aff. Ex. E, at NYDS000125, NYDS000111, NYDS000145, NYDS000139, NYDS000140, NYDS000091, NYDS000089, NYDS000118, NYDS000117, NYDS000105, NYDS000105.)  Plaintiff generally

---

[2] The document's date is obscured such that the Court cannot discern the last digit of the year.

denies that any of these complaints or disciplinary write-ups has merit.  (*See* Sussman

Affirmation Ex. 3, at 42–43; *see also* Pl.'s Rule 56.1 Counterstatement ("Pl.'s Counter 56.1")

¶ 50 (Dkt. No. 59).)  Plaintiff did, however, sign several of the disciplinary write-ups to

acknowledge that he received them.  (*See* Patterson Aff. Ex. E, at NYDS000104, NYDS000102,

NYDS000099, NYDS000126; *see also* Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.)

Separate from his disciplinary write-ups, Plaintiff also received performance reviews.  In

December 2011, Plaintiff scored a 665 out of a possible 1000 points on his evaluation, receiving

eight out of ten points in several categories, including job knowledge, dependability/reliability,

and initiative, five out of ten points in interpersonal skills, efficiency/productivity, and

adaptability, and two out of ten points in professionalism.  (*See* Sussman Affirmation Ex. 16; *see

also* Pl.'s Counter 56.1 ¶ 92; Def.'s Resp. to Pls.' Counterstatement of Material Facts ("Def.'s

Counter 56.1") ¶ 92 (Dkt. No. 65).)  The review notes that "[Plaintiff] is very social and likes to

frequently chat with patients.  This is admirable, but must also remember to complete daily

tasks."  (Sussman Affirmation Ex. 16; *see also* Pl.'s Counter 56.1 ¶ 93; Def.'s Counter 56.1

¶ 93.)

On his evaluation completed in November 2012, Plaintiff scored a 725 out of a possible

1000 points, receiving eight out of ten points in most categories, but receiving five out of ten

points for interpersonal skills, professionalism, and adaptability.  (*See* Sussman Affirmation Ex.

15; *see also* Pl.'s Counter 56.1 ¶ 90; Def.'s Counter 56.1 ¶ 90.)

### 3.  Amanda Warbington's Employment

Amanda Warbington was hired by Defendant on July 26, 2010 as a patient care

technician.  (*See* Patterson Aff. ¶ 19; Patterson Aff. Ex. G; *see also* Def.'s 56.1 ¶ 25; Pl.'s 56.1

¶ 25.)  When Warbington was hired, she filled out a "New Hire Employment Information" form,

wherein she was asked to identify her racial/ethnic classification.  Warbington indicated that she was "Hispanic or Latino," which the form indicated referred to "[a] person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race." (Sussman Affirmation Ex. 5; *see also* Pl.'s Counter 56.1 ¶ 107; Def.'s Counter 56.1 ¶ 107.) Another box, which was not checked by Warbington, allowed a new employee to indicate that he or she was "Black or African American (Not of Hispanic or Latino)."  (Sussman Affirmation Ex. 5.)  In a separate form, which may or not have been filled out by Warbington, Warbington's ethnicity is marked as "Hispanic," and there is nothing in the box marked "Race."  (Sussman Affirmation Ex. 21; *see also* Pl.'s Counter 56.1 ¶ 107; Def.'s Counter 56.1 ¶ 107.)  At her deposition, when asked how she would describe herself "ethnically or racially," Warbington responded: "I would say I'm black.  I am black."  (Klein Decl. Ex. C, at 46.)  When asked if she would ever describe herself as just Hispanic, Warbington responded:  "Yes, if I'm filling out a college application or if it says directly Hispanic, not of black descent or if it says African, not of Hispanic descent.  Then I would check Hispanic."  (*Id.* at 49.)  Maria Guasp, one of the individuals involved in the decision to ultimately terminate Plaintiff's employment, testified that Warbington is Black.  (*See* Klein Decl. Ex. A, at 104.)  Denise Patterson, another individual involved in the decision to terminate Plaintiff's employment, testified that it was her understanding and the understanding of all four individuals involved in the decision to terminate Plaintiff's employment that both Plaintiff and Warbington are Black.  (*See* Patterson Aff. ¶ 31.)

Prior to the incident giving rise to this case, Warbington had received only one verbal warning for behavioral issues, (*see* Patterson Aff. ¶ 20; Patterson Aff. Ex. H), one verbal warning for failure to comply with patient care policies, (*see* Sussman Affirmation Ex. 6, at NYDS000318), and one written warning for failure to comply with infection control policies,

(*see id.* at NYDS000319–NYDS000320).  Though Plaintiff denies all of this in his 56.1 statement, the documents cited to by counsel plainly support Defendant's account of Warbington's disciplinary history.  (*See also* Pl.'s Counter 56.1 ¶¶ 94–98 (relaying Warbington's disciplinary history); Def.'s Counter 56.1 ¶¶ 94–98.)

### 4.  The September 13, 2013 Incident

On the evening of September 13, 2013, Plaintiff, Warbington, and Dierdra Maldonado, another employee, were working together at the Middletown Clinic.  (*See* Klein Decl. Ex. B, at 162–63; *see also* Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.)  Maldonado was a registered nurse and was new to the job.  (*See* Klein Decl. Ex. B, at 163; *see also* Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)  The three were closing down the Middletown Clinic when Plaintiff pointed out to Maldonado that the bicarbonate and the water tanks needed to be emptied.  (*See* Klein Decl. Ex. B, at 163; *see also* Def.'s 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)  The Parties' respective accounts of the incident diverge at this point.  Plaintiff avers that before Maldonado could even respond, Warbington interjected and called Plaintiff stupid for asking Maldonado about emptying the tanks.  (*See* Sussman Affirmation Ex. 3, at 164–65; *see also* Pl.'s Counter 56.1 ¶ 3.)  Warbington and Maldonado, by contrast, testified that before Warbington interjected, Maldonado informed Plaintiff that she did not know anything about how the tanks in the water room were operated, and that it was not until Plaintiff pressed Maldonado again about the tanks that Warbington intervened and told Plaintiff she would take care of them.  (*See* Klein Decl. Ex. C, at 18–19; Klein Decl. Ex. E, at 11–14.)  The Parties agree, however, that at the conclusion of this exchange, Maldonado asked Warbington to show her how to empty the tanks and the two walked away from Plaintiff and went into the water room together.  (*See* Klein Decl. Ex. B, at 174; Klein Decl. Ex. C, at 21; Klein Decl. Ex. E, at 18; *see also* Def.'s 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.)

In the water room, another confrontation occurred, though the Parties again dispute the precise facts.  Warbington and Maldonado testified that while they were examining the water tanks together, Plaintiff entered the water room and began screaming in Warbington's face, telling Warbington that he was sick of her talking down to him and warning Warbington that he would tell Guasp, their supervisor, about her.  (*See* Klein Decl. Ex. C, at 34–35; Klein Decl. Ex. E, at 24.)  Maldonado interjected at this point and encouraged Plaintiff to tell Guasp about the incident.  (*See* Klein Decl. Ex. E, at 26.)  Plaintiff then "lost it," making a beeline for Warbington, and got very close to her face, yelling obscenities at Warbington.  (*See id.* at 26–27.)  Plaintiff was, in fact, so close to Warbington's face that his yelling caused Warbington's hair to move.  (*See id.* at 28.)  Because of where Warbington and Plaintiff were standing in relation to the water tanks in the room, Warbington could not move away from Plaintiff.  (*See id.* at 32.)  At one point, Maldonado put her hand on Plaintiff's shoulder, (*see id.* at 29–30), and later put her hand between Plaintiff and Warbington in an effort to guide Plaintiff out of the room, (*see id.* at 30; Sussman Affirmation Ex. 8, at 42).  Warbington warned Plaintiff that if he did not get out of her face, she would hit him, (*see* Sussman Affirmation Ex. 8, at 42), and told Plaintiff that if he touched her, she would call the cops, (*see* Klein Decl. Ex. E, at 30).  Plaintiff never touched or threatened to harm Warbington.  (*See id.* at 42.)

Plaintiff tells a different story.  According to Plaintiff, he returned to the water room to complete some of his duties.  (*See* Sussman Affirmation Ex. 3, at 176.)  When Plaintiff returned to the water room, where Warbington and Maldonado were discussing the water tanks, Warbington approached Plaintiff, got in his face, and told Plaintiff that she would punch him.  (*See id.* at 177.)  Plaintiff denies that he started yelling at Warbington when he entered the water room and denies that he pinned Warbington such that she could not move away from him.  (*See*

9

*id.* at 179.)  Nor did Plaintiff get in Warbington's face or yell so forcefully that Warbington's hair moved.  (*See id.*)  Plaintiff also attests that Warbington never stated that she would call the police if Plaintiff touched her.  (*See id.* at 185.)

5.  Investigation of the Incident

The next day, Warbington contacted her supervisor, Guasp, and told her what happened. (*See* Klein Decl. Ex. C, at 56; *see also* Def.'s 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.)  Guasp was unavailable to investigate the incident at that time and told Warbington to call Beverly Gardner, who was covering for Guasp while she was on vacation.  (*See* Klein Decl. Ex. A, at 24, 26; Klein Decl. Ex. C, at 56; *see also* Def.'s 56.1 ¶ 48; Pl.'s 56.1 ¶ 48.)  After speaking with Warbington, Guasp left a voicemail for Gardner telling her that Warbington would be contacting her.  (*See* Klein Decl. Ex. A, at 27; *see also* Def.'s 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)  Warbington ended up speaking with Terri Silverman, the Director of Operations, by phone and communicated the details of the incident.  (*See* Klein Decl. Ex. C, at 102–03.)

On September 16, 2013, Denise Patterson, the Director of Employee Relations at Defendant, spoke with Silverman regarding the incident on September 13.  (*See* Klein Decl. Ex. F, at 12–13; *see also* Def.'s 56.1 ¶ 52; Pl.'s 56.1 ¶ 52.)  Patterson, Guasp, Gardner, and Silverman (and possibly another) came to a group consensus that Plaintiff would be suspended during the investigation based on the allegation that Plaintiff had backed Warbington into a wall and had caused her to feel a threat of physical danger.  (*See* Klein Decl. Ex. A, at 57–58; *see also* Defs.' 56.1 ¶ 52; Pl.'s 56.1 ¶ 52.)  Patterson instructed Silverman to interview Plaintiff, Warbington, and Maldonado regarding the incident and to take someone with her as a witness. (*See* Klein Decl. Ex. F, at 13–14; *see also* Def.'s 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

Sometime thereafter, Silverman and Gardner conducted interviews of Plaintiff, Warbington, and Maldonado.  (*See* Klein Decl. Ex. F, at 14; *see also* Def.'s 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.)  On September 16, Silverman and Gardner interviewed Plaintiff at work and asked him questions regarding the incident.  (*See* Klein Decl. Ex. B, at 190–91; Klein Decl. Ex. F, at 14; *see also* Def.'s 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)  Plaintiff testified that although he knew Silverman and Gardner worked for Defendant, they did not identify themselves to him.  (*See* Sussman Affirmation Ex. 3, at 194; *see also* Pl.'s Counter 56.1 ¶ 28; Def.'s Counter 56.1 ¶ 28.)  Silverman and Gardner asked him about the incident on September 13, though they repeated some questions several times.  (*See* Sussman Affirmation Ex. 3, at 194–96; *see also* Pl.'s Counter 56.1 ¶ 29.)  Plaintiff inferred from the fact that Silverman and Gardner were asking him the same questions multiple times that they had already made up their mind about what happened.  (*See* Sussman Affirmation Ex. 3, at 196; *see also* Pl.'s Counter 56.1 ¶ 30; Def.'s Counter 56.1 ¶ 30.)  Plaintiff asked Silverman and Gardner whether they wanted him to go home, and they told him he could go home.  (*See* Sussman Affirmation Ex. 3, at 196; *see also* Pl.'s Counter 56.1 ¶¶ 38–39; Def.'s Counter 56.1 ¶¶ 38–39.)  All told, the meeting lasted approximately 30 to 35 minutes.  (*See* Klein Decl. Ex. B, at 200; *see also* Def.'s 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.)

Gardner also interviewed Maldonado, who relayed the same story to which she testified at her deposition.  (*See* Klein Decl. Ex. E, at 60; *see also* Def.'s 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.)  Warbington was also interviewed by Silverman and Gardner.  (*See* Klein Decl. Ex. C, at 103; *see also* Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.)  Warbington gave the details of the entire incident to Silverman and Gardner.  (*See* Klein Decl. Ex. C, at 102–03; *see also* Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.)  Warbington specifically told Silverman and Gardner that she became fearful when

Plaintiff got in her face.  (*See* Klein Decl. Ex. C, at 113; *see also* Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.)

Also on September 16, Guasp spoke with Plaintiff, Warbington, and Maldonado about the incident.  (*See* Klein Decl. Ex. A, at 71; *see also* Def.'s 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)  While the record does not reflect what transpired during Guasp's interview with Plaintiff, Maldonado testified that when she met with Guasp, she again relayed the same story told at her deposition.  (*See* Klein Decl. Ex. E, at 43; *see also* Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.)  Maldonado also told Guasp that she would be uncomfortable if she had to work with Plaintiff and Warbington together again.  (*See* Klein Decl. Ex. E, at 43; *see also* Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60; Pl.'s Counter 56.1 ¶ 42; Def.'s Counter 56.1 ¶ 42.)

After interviewing each of the pertinent parties, Silverman reported back to Patterson to present her findings.  (*See* Klein Decl. Ex. F, at 14; *see also* Def.'s 56.1 ¶ 64; Pl.'s 56.1 ¶ 64.) According to Patterson, Silverman reported the following:

> [Plaintiff] made a statement to [Warbington] that the bicarbs had not transferred, and that [Maldonado] was not qualified to do it.  [Warbington] made a comment back that she was the one in charge to do it, and she called [Plaintiff] stupid; . . . this upset [Plaintiff], where he became agitated and loud and started yelling; . . . [Maldonado] and [Warbington] walked away to go finish what they were doing and get away from [Plaintiff]; . . . [Plaintiff] followed them into the water room screaming, yelling, ensured [sic].
>
> [Warbington] made a comment to [Plaintiff] that she was going to hit him, and [Plaintiff] became even more upset and backed [Warbington] into the wall; [Plaintiff] was so close to her that her hair was moving; [Plaintiff] was screaming and yelling and out of control, and . . . [Maldonado] was trying to intervene and get [Plaintiff] away from [Warbington].
>
> . . . .
>
> [Plaintiff] was just a few inches away from [Warbington], so she is backed into a wall, and he's in front of her, and he is so close to her that his breath from his speaking and yelling was moving her hair. . . .

. . . .

[Plaintiff] . . . was saying—daring [Warbington] to hit him.

(Klein Decl. Ex. F, at 14–15; *see also* Def.'s 56.1 ¶ 65; Pl.'s 56.1 ¶ 65.)  Patterson also kept a

contemporaneous log of the investigation.  (*See* Patterson Aff. Ex. I; *see also* Def.'s 56.1 ¶ 71;

Pl.'s 56.1 ¶ 71.)  Plaintiff disputes the accuracy of Patterson's log because it allegedly contradicts

the hand written notes taken by Gardner during the interview with Plaintiff.  (*See* Pl.'s 56.1 ¶ 71;

*see also* Sussman Affirmation Ex. 14.)

In a discussion with Patterson, Silverman, and Gardner, Guasp also shared the

information she had collected during her investigation, which included Plaintiff's disciplinary

history.  (*See* Klein Decl. Ex. F, at 18–19; *see also* Def.'s 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.)  After

reviewing the pertinent facts, Patterson, Guasp, Silverman, and Gardner made the collective

decision to terminate Plaintiff's employment.  (*See* Klein Decl. Ex. A, at 78–79; Klein Decl. Ex.

F, at 27–28; Patterson Aff. ¶ 28; *see also* Def.'s 56.1 ¶ 68; Pl.'s 56.1 ¶ 68.)  According to Guasp,

the determination was made in part because of Plaintiff's history of similar incidents regarding

his behavior, specifically, incidents where Plaintiff had "blowouts" with various people,

including one just a few months prior to the incident on September 13.  (*See* Klein Decl. Ex. A,

at 79, 82–83.)  Patterson testified that the group particularly relied on Maldonado's statements

because she was a new employee who did not have a stake in the dispute between Plaintiff and

Warbington.  (*See* Patterson Aff. ¶ 28.)  Patterson also noted that Plaintiff had a poor work

record and Guasp's efforts to correct Plaintiff's behavior in the workplace had not been effective.

(*See id.* ¶ 29.)

On September 26, 2013, Silverman informed the union to which Plaintiff belonged that

he had been terminated due to a violation of Defendant's Workplace Violence Policy.  (Sussman

Affirmation Ex. 22; *see also* Pl.'s Counter 56.1 ¶ 108; Def.'s Counter 56.1 ¶ 108.)  The same

information was provided on the corrective action form memorializing Plaintiff's termination.

(*See* Sussman Affirmation Ex. 23; *see also* Pl.'s Counter 56.1 ¶ 110; Def.'s Counter 56.1 ¶ 110.)

      For her part in the incident, Warbington received documented counseling for use of

"language that demonstrated disrespect of [a] colleague . . . which culminated in [a]

conflict/altercation."  (Patterson Aff. Ex. J; *see also* Klein Decl. Ex. F, at 24.)  Patterson testified

that had she been consulted, she would have recommended at least a written warning for

Warbington.  (*See* Sussman Affirmation Ex. 10, at 24–25; *see also* Pl.'s Counter 56.1 ¶ 116;

Def.'s Counter 56.1 ¶ 116.)

### B.  Procedural History

      Plaintiff filed his Complaint on July 7, 2014.  (*See* Dkt. No. 1.)  Discovery commenced

on April 20, 2015.  (*See* Dkt. (minute entry for Apr. 20, 2015); Case Management & Scheduling

Order (Dkt. No. 12).)  All discovery was set to be completed by August 31, 2015.  (*See* Dkt. Nos.

16, 18.)  On September 3, 2015, Defendant filed a pre-motion letter seeking leave to file a

motion for summary judgment.  (*See* Letter from Eve I. Klein, Esq., to Court (Sept. 3, 2015)

(Dkt. No. 21).)  Plaintiff responded on September 7, 2015, opposing the application.  (*See* Letter

from Michael A. Deem, Esq., to Court (Sept. 7, 2015) (Dkt. No. 23).)  On September 9, 2015,

the Court held a conference regarding Defendant's proposed motion.  (*See* Dkt. (minute entry for

Sept. 9, 2015).)  At the conference, Plaintiff's counsel indicated that his theory of the case was

that Plaintiff suffered from national origin and/or gender discrimination.  (*See* Aff. of Eve I.

Klein in Supp. of Mot. for Sanctions ¶¶ 15–16 (Dkt. No. 50).)  Plaintiff's counsel indicated that

he was going to seek leave to file an amended complaint; Defendant's counsel indicated that she

would oppose such an amendment.  (*See id.* ¶¶ 18–19.)  As a result of the conference, the Court

set a briefing schedule for Defendant's motion for summary judgment and also set a schedule for

Plaintiff's motion to amend his complaint.  (*See* Order (Dkt. No. 25).)

Shortly thereafter, on September 16, 2015, Plaintiff's counsel requested permission to

reopen discovery based on the late production by Defendant of Patterson's log of the

investigation.  (*See* Letter from Michael A. Deem, Esq., to Court (Sept. 16, 2015) (Dkt. No. 26).)

Plaintiff's counsel argued that he had been denied an opportunity to depose Patterson and others,

and also contended that Defendant was required to produce additional documents.  (*See id.*)

Defendant's counsel responded by admitting that the document had been produced late, but

clarified that she had offered to produce Patterson for a deposition at the time she produced the

document.  (*See* Letter from Eve I. Klein, Esq., to Court (Sept. 17, 2015) (Dkt. No. 27).)

Defendant's counsel further explained that Plaintiff had elected not to depose Patterson during

discovery, despite knowing of her involvement in the decision to terminate Plaintiff's

employment, and that the newly produced document had not provided any facts not already

made available to Plaintiff.  (*See id.*)  Plaintiff's counsel replied, arguing that he sought not to

depose just Patterson, but also others involved in the decision to terminate Plaintiff's

employment, and that the requested documents were highly relevant to the case based on the

newly produced document.  (*See* Letter from Michael A. Deem, Esq., to Court (Sept. 20, 2015)

(Dkt. No. 28).)  Defendant's counsel filed a reply, reiterating that she had previously offered to

produce Patterson for a deposition and that Plaintiff's counsel was already on notice since early

in discovery that the other individuals he sought to now depose were involved in the

decisionmaking process.  (*See* Letter from Eve I. Klein, Esq., to Court (Sept. 21, 2015) (Dkt. No.

29).)  Counsel further reiterated that the produced document did not materially affect the

information available to Plaintiff during discovery and that all relevant documents had been

produced.  (*See id.*)  The Parties thereafter each filed two additional letters, further discussing Defendant's alleged failure to produce relevant documents.  (*See* Letter from Michael A. Deem, Esq., to Court (Sept. 21, 2015) (Dkt. No. 30); Letter from Eve I. Klein, Esq., to Court (Sept. 21, 2015) (Dkt. No. 31).)

On October 22, 2015, the Court held a conference to discuss Plaintiff's application to reopen discovery.  (*See* Dkt. (minute entry for Oct. 22, 2015).)  At the conference, the Court encouraged Plaintiff to take Defendant up on its offer to produce Patterson for a deposition.  (*See* Tr. 2 (Oct. 22, 2015 conference) (Dkt. No. 39).)  The Court declined Plaintiff's application to allow depositions of other individuals, pointing out that Plaintiff "could have deposed these people beforehand."  (*Id.*)  The Court also declined to compel the production of any additional documents.  (*Id.* at 7–8.)  Plaintiff's counsel later suggested that his client may also have a claim under New York Labor Law.  (*Id.* at 17.)  The Court noted that "[t]his case was a race case until discovery closed and maybe the evidence wasn't lining up the way [Plaintiff's counsel] hoped it would.  Now we're trying to convert it into something else."  (*Id.* at 19.)  When the Court pressed counsel as to whether this case was "still a race case," Plaintiff's counsel responded:

> On the facts that I've learned, I don't know, in the last six weeks of discovery, no. And if I had known all those facts and I was in the case from the beginning perhaps I would have seen it differently.  I don't know but I know for certain that Patterson's document, her memo, changed everything for me, your Honor.  God's honest truth.

(*Id.* at 23–24.)  The Court again permitted Plaintiff to file a motion to amend his complaint to include a claim for gender discrimination.  (*See id.* at 26–27.)  The Court entered an Order giving Plaintiff two weeks to depose Patterson, and one week thereafter to propose a briefing schedule for Plaintiff's proposed motion to amend.  (*See* Order (Dkt. No. 35).)  The Court added that Defendant would not need to seek leave to file a motion for sanctions.  (*See id.*)

On November 19, 2015, Michael H. Sussman, Esq., a partner in the firm representing Plaintiff, wrote a letter to the Court indicating that because prior counsel, Michael A. Deem, was no longer associated with the firm, Mr. Sussman would be reassuming responsibility of the case. (*See* Letter from Michael H. Sussman, Esq., to Court (Nov. 19, 2015) (Dkt. No. 37).)  In the same letter, Mr. Sussman indicated that Plaintiff would not be seeking leave to amend the Complaint and was prepared to oppose Defendant's Motion for Summary Judgment.  (*See id.*) The Court soon after approved a revised schedule for Defendant's Motion for Summary Judgment.  (*See* Dkt. No. 45.)

On March 4, 2016, Defendant filed its Motion for Sanctions and accompanying papers. (*See* Dkt. Nos. 48–50.)  On March 10, 2016, Defendant filed its Motion for Summary Judgment and accompanying papers.  (*See* Dkt. Nos. 51–55.)  Plaintiff's counsel thereafter requested and received permission to respond to the two Motions simultaneously.  (*See* Dkt. No. 57.)  On April 8, 2016, Plaintiff submitted its papers in opposition to Defendant's Motions.  (*See* Dkt. Nos. 58–60.)  Defendant filed its reply papers in support of its Motions on May 9, 2016.  (*See* Dkt. Nos. 63–65.)

## II.  Discussion

### A.  Motion for Summary Judgment

Because the Court's decision on Defendant's Motion for Summary Judgment informs and may be dispositive of Defendant's Motion for Sanctions, the Court will first address summary judgment.

#### 1.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by

documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### 2.  Legal Framework

Plaintiff's federal claim for race discrimination is brought pursuant to 42 U.S.C. § 1981. Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The Second Circuit has construed this provision to prohibit employment discrimination on the basis of race. *See Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 260–61 (2d Cir. 2000) (holding that § 1981 covers claims of employment discrimination brought both by employees working under contract and at-will employees). The Second Circuit has instructed that in order to plead a claim for race discrimination under § 1981, "plaintiffs must allege facts supporting the

following elements: (1) [the] plaintiffs are members of a racial minority; (2) [the] defendants'

intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's

enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). "This

section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms,

and conditions of a contractual relationship, such as employment . . . ." *Patterson v. County of*

*Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).

  At the summary judgment phase, however, the Second Circuit has held that "claims for

race . . . discrimination under [§] 1981 . . . are analyzed under the burden-shifting framework set

forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Ruiz v. County of Rockland*,

609 F.3d 486, 491 (2d Cir. 2010); *see also Barella v. Village of Freeport*, 16 F. Supp. 3d 144,

158 (E.D.N.Y. 2014) ("[C]laims under [§] . . . 1981 . . . are 'all evaluated according to the three-

step burden-shifting framework set forth in *McDonnell*.'" (quoting *Jackson v. City of New York*,

No. 11-CV-3028, 2014 WL 1010785, at *4 (E.D.N.Y. Mar. 17, 2014)). Under that familiar

framework, unless the plaintiff has direct evidence of discrimination, that plaintiff must proceed

by first establishing a prima facie case of discrimination. *See Ruiz*, 609 F.3d at 491. In the

context of an allegedly discriminatory discharge, a plaintiff must show that "(1) he is a member

of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse

employment action; and (4) the adverse action took place under circumstances giving rise to the

inference of discrimination." *Id.* at 492. Once a plaintiff has established a prima facie case, the

burden shifts to the defendant to "offer a legitimate nondiscriminatory reason for the

termination." *Id.* If the defendant is able to do so, the burden shifts back to the plaintiff to

"show that the real reason for [the] plaintiff's termination was his race," *id.*, that is, the

defendant's proffered reason for the adverse employment action was a pretext for discrimination,

*see Patterson*, 375 F.3d at 221.  In order to establish a claim under § 1981, "the plaintiff must

show . . . that the discrimination was a 'substantial' or 'motivating factor' for the defendant's

actions." *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (some internal quotation marks

omitted) (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 868 (2d Cir. 1998)).

In general, "[t]he standard for intentional discrimination under [N.Y. Exec. Law] § 296 is

identical to that for claims of discrimination pursuant to § 1981." *Clark v. City of New York*, No.

13-CV-210, 2014 WL 4804237, at *4 (E.D.N.Y. Sept. 25, 2014); *see also Ford v. Consol.*

*Edison Co. of N.Y., Inc.*, No. 03-CV-9587, 2006 WL 538116, at *19 (S.D.N.Y. Mar. 3, 2006)

("A claim of discrimination pursuant to [N.Y. Exec. Law] § 296 is subject to the same analysis

as a claim of discrimination under federal law.").  Thus, for the purposes of Defendant's Motion

for Summary Judgment, if Plaintiff's § 1981 claim falls, so must his claim under N.Y. Exec. Law

§ 296.

### 3.  Prime Facie Case

The first issue for the Court is whether Plaintiff has established a prima facie case for

discrimination.  The Parties do not dispute that Plaintiff is a member of racial minority, that he

was qualified for the position he held, or that he suffered an adverse employment action.  The

Parties do dispute, however, whether a trier of fact could infer from the evidence that the adverse

action took place under circumstances giving rise to an inference of discrimination.

Defendant first contends that Plaintiff cannot establish that his termination took place

under circumstances giving rise to an inference of discrimination because Warbington, the

comparator whom Plaintiff identifies as "similarly situated" for race discrimination purposes, is

Black, the same race as Plaintiff.  (*See* Mem. of Law in Supp. of Def.'s Mot. for Summ. J.

("Def.'s Mem.") 11 (Dkt. No. 52).)  Ordinarily, a plaintiff can satisfy his prima facie burden "by

showing that the employer subjected him to disparate treatment, that is, treated him less

favorably than a similarly situated employee outside his protected group." *Graham v. Long*

*Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  A number of cases in the Second Circuit have

recognized that a plaintiff alleging race discrimination cannot establish that he was terminated in

circumstances giving rise to an inference of discrimination where the similarly situated

comparators are of the same protected class.  *See Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-

CV-3625, 2013 WL 3968748, at *10 (E.D.N.Y. July 30, 2013) ("[The] [p]laintiff's argument that

his termination was a result of racial or national origin animus would be discredited because his

alleged comparators . . . are of the same race and national origin as [the] [p]laintiff and neither

was terminated."); *Henny v. New York State*, 842 F. Supp. 2d 530, 555 n.24 (S.D.N.Y. 2012)

(holding that the existence of other African-American employees who were not terminated

"undermine[d] any inference that [the] [d]efendants [fired the plaintiff] *based on discriminatory*

*animus* against African-Americans"); *Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407,

426 n.7 (S.D.N.Y. 1999) (holding that because all of the comparators identified by the plaintiff

were of the same race as the plaintiff, he could not "claim that employees outside the Title VII

protected class were treated differently than those within the protected class"), *aff'd*, 201 F.3d

430 (2d Cir. 1999); *Harmon v. Runyon*, No. 96-CV-6080, 1997 WL 786383, at *5 (S.D.N.Y.

Dec. 19, 1997) (holding that because all of the comparators identified by the plaintiff were of the

same race as of the plaintiff, the "[p]laintiff [could not] claim, therefore, that employees outside

the Title VII protected classes were treated differently than those within the protected classes").

The Parties do not appear to dispute the applicable law, but dispute only whether

Warbington is Black.  (*See* Def.'s Mem. 11; Mem. of Law in Opp'n to Def.'s Mots. for Summ. J.

& Sanctions ("Pl.'s Mem.") 14 (Dkt. No. 60).)  Defendant points to the testimony of

Warbington, who identified herself as Black at her deposition, (*see* Klein Decl. Ex. C, at 46), and the testimony of Guasp and Patterson, who each testified that they believe Warbington is Black, (*see* Klein Decl. Ex. A, at 104; Patterson Aff. ¶ 31).  Plaintiff objects, noting that Warbington identified herself as "Hispanic" on her new-hire forms and did not check any boxes suggesting she is Black.  (*See* Sussman Affirmation Exs. 5, 21.)

To be sure, as Plaintiff asserts, the Second Circuit has held that "it has long been settled in [the Second] [C]ircuit that Hispanics comprise a distinct race for purposes of § 1981." *Village of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016).  In the same opinion, however, the Second Circuit also held that "someone may belong to more than one 'race' for purposes of [§ 1981]." *Id.* at 605.  There is thus nothing inherently inconsistent about Warbington identifying herself as both Hispanic and Black.  Moreover, Plaintiff offers no objection to Warbington's explanation, supported by the record, that she marked only "Hispanic" on the new-hire forms because the box for "Black" specifically excluded persons of Hispanic or Latino descent.  (*See* Sussman Affirmation Ex. 5.)  Indeed, it would be decidedly inconsistent with Warbington's testimony if she had checked a box that made clear it did not apply to persons of Hispanic or Latino descent.  It is unclear what boxes Plaintiff thinks Warbington should have checked in order to represent the racial and ethnic identity she expressed at her deposition.

The Court is admittedly ill-equipped to make judgments about whether a certain individual is of a specific race, but here, there is no serious fact dispute between the Parties; the only dispute is one manufactured by Plaintiff's counsel.  And the relevant question is not whether Warbington is actually Black, whatever that term may mean; the inquiry is what the individuals involved in the decision to terminate knew or believed.  *See Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 191 (S.D.N.Y. 2011) (dismissing a claim for religious

discrimination where the plaintiff did "not . . . allege that . . . [the defendant] or its employees knew of [the plaintiff's] religious beliefs.  Indeed, the [complaint] fail[ed] to allege that anybody at [the defendant], much less a decision-maker, was *actually* aware that [the plaintiff] [was], in fact, a practicing Muslim"); *id.* ("Nor does the [proposed amended complaint] allege . . . that any . . . employee even perceived that [the plaintiff] was a Muslim . . . ."); *LaBella v. N.Y.C. Admin. for Children's Servs.*, No. 02-CV-2355, 2005 WL 2077192, at *18 (E.D.N.Y. Mar. 28, 2005) ("[E]ven if [the supervisor's] decision to terminate [the] plaintiff was informed by erroneous facts or mistaken beliefs, it was nevertheless based on non-discriminatory reasons.").  Aside from Plaintiff's citation to Warbington's new-hire forms, which say nothing about whether Warbington is Black, only whether she is also Hispanic, Plaintiff offers no evidence refuting Patterson's testimony that she and the other individuals responsible for terminating Plaintiff's employment believed that both Plaintiff and Warbington are Black.  (*See* Patterson Aff. ¶ 31.)

As Defendant points out, Plaintiff could have, but did not, raise a claim that Plaintiff was discriminated against because Warbington is Hispanic and Plaintiff is not.  (*See* Def.'s Mem. 12.) *See also Barella*, 814 F.3d at 605 ("Because § 1981 also forbids so-called 'reverse discrimination,' our 1988 holding in *Albert* [*v. Carovano*, 851 F.2d 561 (2d Cir. 1988)] necessarily implied that § 1981 also protects against discrimination based on *lack of* Hispanic ethnicity—something we had already assumed several years earlier.").  Instead, the Complaint alleges only that Plaintiff was discriminated against because Defendant terminated his employment and not the employment of the "non-black technician who provoked [Plaintiff's] response."  (Compl. ¶ 21.)  Thus, while Warbington's new-hire forms indicate that she identifies, at least in part, as Hispanic, Plaintiff must prove, consistent with his allegations, not that Warbington is Hispanic and Plaintiff is not, but that Plaintiff is Black (uncontested) and that

24

Warbington is not.  Plaintiff cannot change course now and allege discrimination on the basis of Warbington's Hispanic identity.  *See Seeman v. Gracie Gardens Owners Corp.*, 794 F. Supp. 2d 476, 482 (S.D.N.Y. 2011) ("Allowing [the plaintiff] to proceed on this new theory of liability would effectively amend the complaint that the summary judgment stage.  'An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.'" (quoting *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010)); *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010) ("[C]ourts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment.").  The undisputed record shows that Warbington is Black, even if she also identifies as Hispanic, and thus Plaintiff's claim for race discrimination is hamstrung by that fact.

Contrary to the Parties' apparent belief, this conclusion does not end the matter.  The Second Circuit has indicated that although "a plaintiff who cannot show an employer's 'preference for a person not of the plaintiff's protected class' will usually be unable to sustain a claim of disparate treatment," *Barella*, 814 F.3d at 601 n.9 (alteration omitted) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)), it has "nonetheless suggested that a plaintiff may be able to plead a prima facie case under Title VII even without showing that the defendant favored someone outside of the plaintiff's protected class," *id.* (italics omitted).  Thus, even assuming Plaintiff and Warbington are both Black, the Court must examine whether there are any other circumstances giving rise to an inference of discrimination.

On this point, however, Plaintiff's prima facie case crumbles.  Outside of Plaintiff's contention that Warbington was treated more favorably, Plaintiff offers no evidence, or even allegations, that he was discriminated against on the basis of race.  (*See* Compl. ¶¶ 21–22; Pl.'s Mem. 13.)  Thus, while in some cases, a plaintiff may be able to establish a prima facie case of

25

discrimination even where there are no similarly situated comparators who are not members of the same protected class, Plaintiff has made no effort to establish such a case here.

Even assuming, however, that Warbington is not Black, Plaintiff has not established that she is a similarly-situated comparator for purposes of proving race discrimination.  In order to show that a plaintiff is similarly situated to another employee, "the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  Although the similarly situated comparators need not be identically situated to the plaintiff, "those employees must have a situation sufficiently similar to [the] plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  Courts in the Second Circuit have routinely recognized that a materially dissimilar disciplinary history may disqualify a peer employee from being deemed similarly situated to a plaintiff. *See, e.g.*, *Rommage v. MTA Long Island R.R.*, No. 08-CV-836, 2010 WL 4038754, at *9 (E.D.N.Y. Sept. 30, 2010) (granting the defendant's summary judgment motion upon "considering that [the] plaintiff's disciplinary history is far worse than that of the comparators" and collecting cases); *McKinney v. Bennett*, No. 06-CV-13486, 2009 WL 2981922, at *7 (S.D.N.Y. Sept. 16, 2009) (holding that "[n]o reasonable jury could find that [the plaintiff] [was] similarly situated to . . . the white troopers he attempts to compare himself to[]" because the plaintiff had "not shown these people to have a comparable disciplinary history to his own or to have any disciplinary history at all"); *Padilla v. Harris*, 285 F. Supp. 2d 263, 270–71 (D. Conn. 2003) (granting summary judgment in favor of the defendant because the proposed comparator had a

"fundamentally different" disciplinary record and noting that "[p]rior disciplinary problems may be sufficient to justify differential treatment of otherwise similarly situated employees").

Here, Plaintiff has, by the Court's count, 14 disciplinary complaints filed against him related to his inappropriate or aggressive behavior.  (*See* Patterson Aff. Ex. E.)  Of those complaints, nine resulted in formal corrective action.  (*See id.*)  Plaintiff was last disciplined in 2008, when he was suspended three days for use of vulgar and indiscrete language, (*see id.* at NYDS000111), and the last formal complaint against Plaintiff related to his behavior was filed by a coworker in August 2012, (*see* Patterson Aff. Ex. F.)  Guasp also testified that Plaintiff had an undocumented incident earlier in 2013, where he became aggressive and belligerent with her because of a directive she had given him.  (*See* Klein Decl. Ex. A, at 83.)  In addition, Plaintiff was reprimanded for a number of other infractions related to his job responsibilities.  (*See id.*)  By contrast, prior to the incident on September 13, Warbington was disciplined only once, on December 29, 2011, for inappropriate behavior.  (*See* Sussman Affirmation Ex. 6, at NYDS000317.)  Her two other disciplinary infractions related to her job performance, not her behavior.  (*See id.* at NYDS000318–NYDS000320.)  Plaintiff argues that a reasonable jury could nonetheless conclude that Plaintiff and Warbington were similarly situated in terms of disciplinary history, particularly in light of Guasp's testimony that if an employee was written up for an infraction but was not written up again for several years, she may ignore the prior infraction when determining how to discipline a subsequent infraction.  (*See* Pl.'s Mem. 16 (citing Sussman Affirmation Ex. 9, at 80–81).)

"Generally, whether two entities are similarly situated is a factual issue that should be submitted to the jury."  *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007).  However, "this rule is not absolute and 'a court can properly grant summary judgment where it is

clear that no reasonable jury could find the similarly situated prong met.'"  *Id.* at 790–91

(quoting *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir.

2001)).  Here, the Court cannot conceive how a reasonable juror could find that Plaintiff and

Warbington were similarly situated.  Plaintiff's disciplinary history is not only voluminous, it

also relates to the precise conduct for which he was ultimately terminated.  Meanwhile, though

Warbington had a disciplinary write-up for similar behavior, she had only one for an incident

two years prior to the September 13 incident.  Moreover, Plaintiff had already received a Final

Warning and a suspension for inappropriate behavior, (*see* Patterson Aff. Ex. E, at

NYDS000102, NYDS000111), whereas Warbington had received only a verbal warning for her

behavior, (*see* Sussman Affirmation Ex. 6, at NYDS000317).  Other courts have held that

disparities of this or lesser magnitude warrant summary judgment.  *See Wood v. N.Y.C. Transit

Auth.*, No. 11-CV-3560, 2015 WL 1469398, at *10 (E.D.N.Y. Mar. 30, 2015) (finding that the

plaintiff was not similarly situated to another employee because the plaintiff's employment

record, "which included a thirty-day suspension due to a 'major preventable' accident," was

"materially worse than [the comparator's] operating record, which only contained a one-day

suspension"); *Shepherd v. BCBG Max Azria Grp., Inc.*, No. 11-CV-7634, 2012 WL 4832883, at

*19 (S.D.N.Y. Oct. 11, 2012) (holding that a comparator was not similarly situated where human

resources "had received numerous written complaints about [the plaintiff] purporting to reveal

continuous and ongoing performance and disciplinary issues that remained uncorrected after

repeated warnings," but the plaintiff had "submitted evidence only of two isolated instances of

misconduct by [the comparator]"), *adopted by* 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012);

*Padilla*, 285 F. Supp. 2d at 270 (finding that a comparator was not similarly situated to the

plaintiff because the "[p]laintiff had a five day suspension for client neglect in contrast to the

sole blemish on [the comparator's] nineteen year work record, which was a reprimand for failure

to report to work one day, with no evidence of any impact on client welfare"); *Tomasino v.*

*Mount Sinai Med. Ctr. & Hosp.*, No. 97-CV-5252, 2003 WL 1193726, at *14 (S.D.N.Y. Mar. 13,

2003) ("None of the comparators mentioned by [the plaintiff] committed the most serious of the

infractions for which [the plaintiff] was discharged . . . ."). The discrepancy between Plaintiff's

and Warbington's disciplinary records here is striking not just for the number of Plaintiff's

disciplinary infractions, but also for the pattern of inappropriate behavior that pervaded

Plaintiff's employment tenure.

Plaintiff's invocation of Guasp's deposition testimony is unavailing. While Guasp was

certainly permitted to afford leniency to an employee with a lengthy disciplinary history, the fact

is that in this circumstance, she did not. Both Guasp and Patterson testified that Plaintiff's

disciplinary history and his inability to correct his behavior were relevant to their decision to

terminate Plaintiff's employment. (*See* Klein Decl. Ex. A, at 82–84; Patterson Aff. ¶ 29.) There

is no law compelling an employer to grant leniency to an employee simply because it retains

discretion to do so.

Similarly unpersuasive is Plaintiff's contention that because Guasp was the supervisor

who both issued many of Plaintiff's disciplinary warnings and participated in the decision to

terminate Plaintiff's employment, and because Plaintiff refutes the facts underlying his

disciplinary write-ups, a reasonable juror could discredit the disciplinary write-ups and conclude

that Plaintiff and Warbington were, in fact, similarly situated. (*See* Pl.'s Mem. 16–17.)

Plaintiff's argument regarding Guasp's role as both a supervisor and a disciplinarian is

hopelessly circular—Plaintiff cannot undermine the credibility of the disciplinary write-ups

merely by pointing to the fact that the person who terminated his employment was also the

person who disciplined him.  The point of impugning the disciplinary write-ups is, after all, to establish that Warbington was similarly situated such that Plaintiff can make out a prima facie case that Guasp discriminated against him.  Plaintiff's argument puts the cart before the horse— he cannot undermine the credibility of Guasp's disciplinary write-ups without first proving that Guasp actually harbored discriminatory animus, and he cannot establish Guasp's discriminatory animus without first making out a prima facie case by pointing to a similarly-situated comparator.  That Plaintiff faces this logical conundrum serves only to highlight the absence of any evidence that Defendant discriminated against Plaintiff.

The fact that Plaintiff denies the underlying facts of the disciplinary write-ups also is of no help.  Plaintiff cites to *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291 (N.D.N.Y. 2013), for the proposition that a plaintiff may meet his burden by showing that the disciplinary history upon which a termination decision was predicated was pretextual.  (*See* Pl.'s Mem. 17.)  But Plaintiff reads *Bader* too broadly.  First, the court there was examining pretext, not whether two employees were similarly situated.  *See Bader*, 985 F. Supp. 2d at 313.  Moreover, the court examined each prior disciplinary infraction and considered evidence submitted by the plaintiff that would allow a reasonable trier of fact to conclude that the discipline imposed was mere pretext for discrimination.  *See Bader*, 985 F. Supp. 2d at 313–16.  The court did not allow the plaintiff to make her case, however, by merely disputing the factual accuracy of the underlying disciplinary charges.  The court, in fact, noted that with respect to one of the disciplinary charges contested by the plaintiff, "[m]anagement's failure to credit [the] [p]laintiff's account over [a coworker's] is not evidence of pretext, especially because [the] [p]laintiff has not alleged that male employees' version of events were usually credited over their supervisors.'"  *Id.* at 316.  The court thus made clear that although a plaintiff could point to impermissibly discriminatory

practices to undermine the bases for her discharge, she could not do so merely by disagreeing with her employer's account of the facts.  Similarly, Plaintiff cannot make out a prima facie case of discrimination merely by asserting that the disciplinary charges that partly gave rise to this termination were predicated on false facts.

Consistent with the long line of cases in the Second Circuit holding the same, the Court determines that the stark differences between Plaintiff's and Warbington's disciplinary histories precludes a reasonable trier of fact from concluding that the two were similarly situated for purposes of Plaintiff's race discrimination claim.  Thus, because no reasonable jury could conclude that Plaintiff was terminated under circumstances giving rise to an inference of discrimination, Plaintiff has failed to make a prima facie case for race discrimination, and his claims must fail.

### 4.  Pretext

Even assuming, however, that Plaintiff could make out a prima facie case, summary judgment in favor of Defendant would still be warranted.

There is no dispute between the Parties that Defendant's articulated reason for terminating Plaintiff's employment—the conflict with Warbington and his disciplinary history— satisfies Defendant's burden of stating a legitimate nondiscriminatory reason for the adverse employment action.  (*See* Pl.'s Mem. 19.)  *See also Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are 'legitimate reasons for firing an employee.'" (quoting *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996)).  Instead, Plaintiff argues that assuming, as the Court must at this phase, that his account of the September 13 incident is accurate, a reasonable trier of fact could

conclude that Plaintiff did not violate the Workplace Violence Policy and that, accordingly, Defendant's reason for terminating Plaintiff's employment is pretextual.

Importantly, this is not a case where Plaintiff has adduced facts showing that the charges against him were fabricated by the decisionmakers.  Nor is this a case where a decisionmaker failed to adequately investigate a claim of misconduct.  Instead, this is a case where decisionmakers were faced with two similar, but not identical, accounts of an incident involving Plaintiff.  Accepting, as the Court must at this stage, that Plaintiff's account of the September 13 incident is accurate, however, does nothing to advance Plaintiff's claim that discrimination was a "motivating" factor for his determination—it would prove only that Defendant came to the wrong conclusion about a dispute between two coworkers.  Put differently, the fact that Defendant may have incorrectly credited Warbington's and Maldonado's account of the incident does not give rise to a conclusion that its mistake was based on discriminatory animus.  *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against [the] plaintiff.  We are interested in what '*motivated* the employer . . . .'" (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *see also Ramsaran v. Booz & Co. (N.A.) Inc.*, No. 14-CV-708, 2015 WL 5008744, at *10 (S.D.N.Y. Aug. 24, 2015) ("Even assuming [the defendant's] assessment of [the] plaintiff's job performance *was* inaccurate, 'what is significant is that they based their decision to dismiss plaintiff on *that* belief,' rather than her gender or pregnancy." (quoting *Agugliaro v. Brooks Bros.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996)); *Uribe v. Kellogg's Snacks/Keebler, Inc.*, No. 05-CV-2959, 2009 WL 1098369, at *6 (S.D.N.Y. Apr. 22, 2009) ("In determining pretext, the issue is not whether the employer reached a correct conclusion in attributing fault with respect to workplace altercations, but whether the employer

made a good-faith business determination." (alteration and internal quotation marks omitted)). The undisputed facts here show that the decisionmakers were under the belief, even if a mistaken one, that Maldonado provided an accurate account of the incident, and based on that account, they believed Plaintiff's conduct was more egregious, more unacceptable, and more in need of a serious response than Warbington's. (*See* Patterson Aff. ¶¶ 28, 30.) Plaintiff's dispute with the underlying facts of the incident or the severity of his conduct does not, on its own, give rise to an inference of discrimination. *See Fenner v. News Corp.*, No. 09-CV-9832, 2013 WL 6244156, at *20 (S.D.N.Y. Dec. 2, 2013) ("The fact that [the plaintiff] disagrees with his performance reviews is insufficient to meet his burden. Even if [the plaintiff] has raised evidence to challenge whether [the] [d]efendants' evaluation of him was fair objectively, he has not shown that [the] [d]efendants' evaluation of his perceived deficiencies was a pretext for their decision to terminate his employment."); *LaGrande v. Key Bank Nat'l Ass'n*, 393 F. Supp. 2d 213, 222–23 (S.D.N.Y. Sept. 28, 2005) ("[The] [p]laintiff merely disputes that his employment conduct was not inappropriate, or that his work was unsatisfactory. Therefore, on this record, a reasonable jury could only find that [the] plaintiff had not met his burden of proving that [the] defendant's decision to terminate his employment was motivated by his race or gender.").

Nor can Plaintiff make his case by arguing that, assuming Plaintiff's and Warbington's disciplinary records were comparable enough to make them similarly situated, Defendant erred in discharging Plaintiff, but not Warbington. The decisionmakers considered Plaintiff's conduct and disciplinary history more egregious than Warbington's. (*See* Patterson Aff. ¶ 30.) Plaintiff's, or even the Court's, disagreement with that judgment is not grounds for a discrimination claim—it is not the province of the Court or a trier of fact to second-guess the business judgment of an employer. *See Brooks v. Blank*, No. 10-CV-8124, 2014 WL 1495774,

33

at *11 n.2 (S.D.N.Y. Mar. 31, 2014) ("An employer has the prerogative to discharge an employee on the basis of subjective business judgments, for any reason that is not discriminatory; it is not the job of the [c]ourt to question the employer's means to achieve a legitimate goal." (internal quotation marks omitted)); *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 375 (E.D.N.Y. 2013) ("Federal courts do not have a roving commission to review business judgments, and thus, evidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." (alteration, citation, and internal quotation marks omitted)), *aff'd*, 578 F. App'x 34 (2d Cir. 2014). Plaintiff's arguments about the length of time between write-ups and his positive performance reviews are quintessential efforts to challenge the reasonability, rather than the motivation, of Defendant's decision to terminate his employment. Such arguments do not salvage Plaintiff's claim.

Admittedly, the Second Circuit has recognized that there is a "risk that false negative performance reports or arbitrary procedures may be employed to cover illegal discrimination," and that "bizarre or duplicitous processes might strengthen a plaintiff's showing of pretext." *McPherson*, 457 F.3d at 216 n.7. But Plaintiff has made no such showing. To the contrary, the record indicates that Defendant engaged in a thorough investigation, interviewing all witnesses to the incidents twice and reviewing the disciplinary record of both Plaintiff and Warbington. Plaintiff has raised no allegation nor adduced any proof that Defendant deviated from ordinary procedures or that the investigation treated Plaintiff differently from other employees accused of similar conduct—in fact, the evidence shows that Defendant subjected Warbington to at least as thorough an investigation as Plaintiff. In the absence of proof showing that Defendant's investigation was unfair, biased, or "bizarre," Plaintiff cannot sustain his claim. *See Blasi v.*

34

*N.Y.C. Bd. of Educ.*, Nos. 00-CV-5320, 03-CV-3836, 2012 WL 3307227, at *28 (E.D.N.Y. Mar. 12, 2012) ("[The] [p]laintiff does not dispute that a student lodged a complaint against him or that Principal Pagano followed the applicable procedures . . . ."), *adopted by* 2012 WL 3307346 (E.D.N.Y. Aug. 12, 2012), *aff'd*, 544 F. App'x 10 (2d Cir. 2013); *Vahos v. Gen. Motors Corp.*, No. 06-CV-6783, 2008 WL 2439643, at *6 (E.D.N.Y. June 16, 2008) ("[The plaintiff] has presented no evidence that [the defendant']s investigation was conducted contrary to normal procedures, or that he was treated differently from other . . . employees accused of similar misconduct.").

In defense of his claim, Plaintiff makes a number of additional arguments.  First, Plaintiff argues that "a reasonable jury could conclude that, despite the participation of four supervisors in the decision to fire [Plaintiff], it was Guasp who recommended and imposed the disparate treatment of [Plaintiff] and Warbington here."  (Pl.'s Mem. 21.)  Even assuming the accuracy of that statement, the fact that it was Guasp, and not the group, who made the decision to terminate Plaintiff's employment would not absolve Plaintiff of proving discriminatory intent on the part of Guasp.  As Plaintiff's claim for discrimination fails under any conception of the law, it cannot be saved merely by invoking the truism that "impermissible bias of a single individual at any stage of the . . . process may taint the ultimate employment decision."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).

Next, Plaintiff contests that, even assuming the decision to terminate his employment was made by the full group, Defendant "has provided no admissible evidence establishing the bases for Gardner's and Silverman's decisions."  (Pl.'s Mem. 22.)  As a matter of record, this statement is false:  Patterson testified as to the group discussions and the justifications for the discipline imposed on Plaintiff.  (*See generally* Patterson Aff.)  If Plaintiff means to say that Defendant has

not offered specific testimony from Gardner and Silverman regarding their subjective state of mind, the absence of such evidence is not helpful to Plaintiff's claim—"[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If Plaintiff intends to show that Gardner and Silverman harbored a discriminatory intent not shared by Patterson or Guasp, it is his burden to adduce such evidence.  In the absence of evidence otherwise showing that Defendant's proffered reason for discharging Plaintiff was pretextual, Plaintiff cannot rely on his own decision not to elicit testimony from Gardner or Silverman to support his claim.

Plaintiff next asserts that a reasonable jury could find that Guasp's previous disciplinary write-ups of Plaintiff were unfounded and pretextual, and that this conclusion could thus allow the jury to conclude that Guasp, despite testifying that she had tried to improve Plaintiff's behavior during his tenure, harbored racial animus throughout Plaintiff's employment.  Again, Plaintiff's argument here is purely conclusory.  The implication is that if a jury determined that the entirety of Plaintiff's disciplinary history was false, it would be entitled to conclude that Guasp harbored racial animus toward Plaintiff.  While this is one theory of Guasp's conduct, it is not one supported by *any* evidence, and Plaintiff's conclusory construction of a narrative helpful to his case is not sufficient to defeat summary judgment.  *See Allen v. County of Nassau*, 90 F. Supp. 3d 1, 7 (E.D.N.Y. 2015) ("[I]t is well-established that a plaintiff who can offer nothing more than his or her own conclusory assertions in support of an allegation of racial discrimination cannot survive a motion for summary judgment."); *Anand v. N.Y. State Dep't of Taxation & Fin.*, No. 10-CV-5142, 2014 WL 810873, at *4 (E.D.N.Y. Feb. 28, 2014)

("[C]onclusory allegations are insufficient to establish that [the] defendants' proffered reasons are false and that discrimination was the real reason for [the] defendants' actions."); *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014) (holding that the plaintiff's "mere subjective belief that she was discriminated against because of her gender does not sustain a gender discrimination claim" (alterations and internal quotation marks omitted)).[3]

In sum, Plaintiff's claim amounts to nothing more than a dissatisfaction with the judgment of his employer about what occurred on the night of September 13 and what the appropriate discipline was. These disputes do not entitle Plaintiff to a trial on his discrimination claim—no reasonable jury could conclude, on the facts presented, that Defendant discriminated against Plaintiff on the base of race.

### B.  Motion for Sanctions

Having concluded that Defendant is entitled to summary judgment, the Court turns to the question of whether sanctions are warranted against Plaintiff.

#### 1.  Applicable Law

Defendant's Motion for Sanctions is predicated on Federal Rule of Civil Procedure 11(b) and 28 U.S.C. § 1927.

Rule 11(b) provides:

> By representing to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

---

[3] The Court gives no weight to Defendant's arguments regarding Plaintiff's deposition testimony. (*See* Def.'s Mem. 17–19.) Plaintiff's obligation at his deposition was to testify truthfully as to the facts within his personal knowledge, not to argue for the sufficiency of his claims. Nor does the Court give weight to the statement of Plaintiff's prior counsel that he was unsure whether the evidence supported a claim for race discrimination. (*See id.* at 19–20.)

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Rule 11(c) goes on the provide that if a court determines that Rule 11(b) has been violated, and after notice and a reasonable opportunity to be heard, "the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."

The standard under Rule 11 is "objective unreasonableness." *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000). "A pleading or motion violates Rule 11 if it is 'frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith.'" *ED Capital, LLC v. Bloomfield Inv. Res. Corp.*, 316 F.R.D. 77, 81 (S.D.N.Y. 2016) (quoting *Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 356 (S.D.N.Y. 2002)). A filing is frivolous if it is "clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Simon DeBartolo Grp., L.P. v. The Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 167 (2d Cir. 1999). The decision whether to impose sanctions under Rule 11 "is . . . committed to the district court's discretion." *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004).

28 U.S.C. § 1927 states that

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

"[A]n award under § 1927 is proper only 'when there is a finding of conduct constituting or akin to bad faith.'" *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 591 (2d Cir. 2016) (quoting *State St. Bank v. Inversiones Errazuriz*, 374 F.3d 158, 180 (2d Cir. 2004)). "The attorney's actions must be 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *Id.* (quoting *State St. Bank*, 374 F.3d at 180)).

### 2. Analysis

The Court concludes that sanctions are not warranted pursuant to § 1927. While Plaintiff's claims are plainly deficient under existing law, the standard under § 1927 does not permit a court to impose sanctions merely because an attorney is overzealous or simply uneducated in a particular area of law. The fact that Plaintiff's counsel has pursued this claim through summary judgment, even though the Court is of the view that Plaintiff has adduced no facts showing that discrimination was a motivating factor for Plaintiff's termination, does not "require" the conclusion that counsel's actions were "undertaken for some improper purpose." *Id.* (internal quotation marks omitted). An alternative explanation is that Plaintiff's counsel simply did not investigate the basis of Plaintiff's claim critically enough to understand the deficiencies.

More difficult, however, is whether sanctions are warranted under Rule 11. That provision implements a different standard, and empowers a court to impose sanctions on a party

or attorney who submits motion papers that are "frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith." *ED Capital, LLC*, 316 F.R.D. at 81 (internal quotation marks omitted).  Defendant points to the fact that Plaintiff's counsel (Mr. Deem) admitted at a pre-motion conference that Plaintiff's race discrimination claim rested on, at best, dubious grounds.  (*See* Mem. of Law in Supp. of Def.'s Mot. for Sanctions Under Rule 11 & 28 U.S.C. § 1927 18–19 (Dkt. No. 49).)  But the question for the Court is not whether Plaintiff's counsel filed the pleading in bad faith, but whether the motion papers are objectively frivolous.  *See Margo*, 213 F.3d at 65 ("[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness.").  While the requirement of an objective analysis is normally used as a sword, allowing courts to sanction even a good-faith, but frivolous, pleading, *see* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (noting that 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments"), the Court sees no reason why it cannot also be used as a shield, defending even a bad faith submission from sanctions if the submission was not, in fact, frivolous.  It is, accordingly, not dispositive that Plaintiff's one-time attorney, who is no longer associated with Mr. Sussman, viewed Plaintiff's race discrimination claim as lacking a factual basis.

Thus, the Court is left with the task of determining whether, viewed objectively, Plaintiff's opposition to Defendant's Motion for Summary Judgment was frivolous.  The Court concludes that, although Plaintiff's opposition was poorly reasoned and the claims meritless, no sanctions are warranted.  First, the opposition papers themselves are not vexatious or otherwise inappropriate.  While Mr. Sussman's response to Defendant's 56.1 statement is not a model of professionalism or effective advocacy, the filings were largely in order, raised cogent, even if

40

incorrect, arguments of law, and sought to introduce material disputes of fact.  Second, although the Court holds that Plaintiff's claims fail on their merits, the law is not so definitive that no reasonable attorney could conceive of at least an argument against summary judgment here.  The Court does not consider this case a close one, but still, the standard is not whether the claim is a loser, but rather whether the claim is so clearly a loser that it is in the interest of justice to deter future plaintiffs and attorneys from prosecuting similar ones.  There is little question that some judicial resources have been wasted by the conduct of Plaintiff's counsel in failing to notice Patterson for a deposition within the discovery period, misrepresenting some facts to the Court in his letter submissions, and compelling Defendant's counsel to appear at a court conference whose only apparent value was to make clear to Plaintiff's counsel how thin his case was.  Nevertheless, the pursuit of justice, particularly in a discrimination case, sometimes requires the exhaustion of judicial resources that may have otherwise been preserved had the parties thought more carefully about their respective positions.  It is not in the interest of justice or fair play to sanction Plaintiff's counsel where, as here, there is a conceivable, even if not legally sound or persuasive, argument that the claims have merit.

Accordingly, Defendant's Motion for Sanctions is denied.  Notwithstanding that sanctions are not appropriate here, the Court finds it necessary to address Plaintiff's contention that Defendant's conduct has been "despicable and, itself, sanctionable."  (Pl.'s Mem. 30.)  Suffice to say, hyperbolic statements such as this one have no place in this Court.  Should Plaintiff wish to move for sanctions against Defendant, he has been and remains free to do so.  Otherwise, the Court finds Plaintiff's pot-shot at Defendant's counsel both unnecessary and unprofessional.  While such a comment does not rise to the level of sanctions, it nonetheless evinces a disregard for the collegiality and civility expected of litigants in this Court.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

Defendant's Motion for Sanctions is denied. The Clerk of Court is respectfully directed to

terminate the pending Motions, (Dkt. Nos. 48, 51), enter judgment for Defendant, and close the

case.

SO ORDERED.

DATED:     January **31**, 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

42